UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RUSSELL G., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-02785-DLP-TWP |
| | ) | |
| ANDREW M. SAUL, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON COMPLAINT FOR JUDICIAL REVIEW

Plaintiff Russell G.[1] seeks judicial review of the denial by the Commissioner

of the Social Security Administration ("Commissioner") of his application for Social

Security Disability Insurance Benefits ("DIB") under Title II and for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42

U.S.C. §§ 423(d), 405(g). For the reasons set forth below, this Court hereby

**REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this

matter for further consideration.

## I. PROCEDURAL HISTORY

On March 30, 2015, Russell filed for disability and disability insurance

benefits, alleging that his disability began on December 4, 2010. Russell's claim was

denied initially on August 4, 2015, and upon reconsideration on December 7, 2015.

---

[1] The Southern District of Indiana has adopted the recommendations put forth by the Court
Administration and Case Management Committee regarding the practice of using only the first
name and last initial of any non-government parties in Social Security opinions. The Undersigned
has elected to implement that practice in this Order.

Russell then filed a written request for a hearing on December 14, 2015, which was granted.

On August 9, 2017, Administrative Law Judge ("ALJ") Belinda J. Brown conducted the hearing, where Russell and a vocational expert testified. On December 29, 2017, ALJ Brown issued an unfavorable decision finding that Russell was not disabled as defined in the Act. On July 12, 2018, the Appeals Council denied Russell's request for review of this decision, making the ALJ's decision final. Russell now requests judicial review of the Commissioner's decision. *See* 42 U.S.C. § 1383(c)(3).

## II.   STANDARD OF REVIEW

To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [him] unable to perform [his] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520. The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant—in light of his age, education, job experience and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir.

2001). Thus, the issue before the Court is not whether Russell is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial-evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues, *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d at 872.

III.  BACKGROUND

A. Factual Background

Russell was 53 years old at the time of the alleged onset date in 2010 and was 60 at the time of his hearing. [Dkt. 8-7 at 10 (R. 273).] He obtained his General Educational Development ("GED") certification. [Dkt. 8-2 at 37 (R. 36).] The Plaintiff has past relevant work history as a service manager and as a taxi driver. [Dkt. 8-3 at 33 (R. 296); Dkt. 8-2 at 38-40 (R. 37-39).]

B. ALJ Decision

In determining whether Russell qualified for benefits under the Act, the ALJ went through the five-step analysis required by 20 C.F.R. § 404.1520(a). At step one, the ALJ found that Russell was insured through December 31, 2016 and had not been engaged in substantial gainful activity since his alleged onset date of disability. [Dkt. 8-2 at 16 (R. 15).] At step two, the ALJ found that Russell's severe impairments included "right shoulder tendonopathy (sic), osteoarthritis, and tears; left shoulder tenosynovitis, osteoarthritis and tears; and right knee meniscal tear," along with the non-severe impairment of depression. [*Id.*]

At step three, the ALJ considered relevant listings for shoulder impairments, knee impairments, and mental impairments, and determined that Russell did not meet or equal any of the listings. [Dkt. 5-2 at 17-18 (R. 16-17).] Next, the ALJ determined Russell had a residual functional capacity ("RFC") to perform light work with the following exceptions:

- only lifting, carrying, pushing, or pulling 20 pounds occasionally and 10 pounds frequently;

5

- standing and/or walking or a combination thereof for a total of 6 of 8 hours and sitting for 6 of 8 hours;

- frequently reaching to the left and right and frequently reaching overhead to the left and the right;

- only climbing stairs and ramps occasionally;

- no climbing of ropes, ladders, or scaffolds;

- no more than occasional balancing and stooping;

- no kneeling, crouching, or crawling;

- never working around unprotected heights or moving mechanical parts;

- never operating a motor vehicle.

[Dkt. 8-2 at 18 (R. 17).] The ALJ then determined, at step four, that Russell could perform his past work as a service manager. Accordingly, the ALJ determined that Russell was not disabled under the Act.

## IV.    Analysis

Russell asserts that substantial evidence fails to support the ALJ's determination that he was not disabled, but makes two[2] general arguments: 1) that the ALJ failed to consider properly whether his shoulder impairments met or medically equaled Listing 1.02B; and 2) that the ALJ failed to properly consider Dr. Estes's neuropsychological examination, which in turn led to an improper evaluation of his cognitive impairments and an inaccurate RFC assessment. The Court will address each challenge in turn.

---

[2] The Plaintiff makes three arguments in his brief, but the second and third issues are intricately related and will be addressed together herein.

## A.  Listing 1.02B

In February 2015, Russell presented to his primary care physician, Dr. Erhard Bell, complaining of shoulder tenderness and decreased range of motion. In May 2015, Dr. Bell evaluated Russell and noted that Russell's pain was aching and rated 10 out of 10. Dr. Bell referred Russell to an orthopedic doctor. [Dkt. 8-38 at 29 (R. 2150).] On June 16, 2015, Dr. Jeffrey Ollo examined Russell in consultation. [Dkt. 8-24 at 7 (R. 1159).] Dr. Ollo evaluated Russell's complaints of bilateral shoulder pain, left greater than right, and, after reviewing the x-rays, diagnosed Russell with bilateral shoulder impingement, acromial joint arthrosis of the left shoulder, and chronic acromial joint separation of the right shoulder. [Dkt. 8-24 at 10 (R. 1162).] Russell was given steroid injections in both shoulders. [*Id.*]

An MRI of the left shoulder performed on July 30, 2015 revealed moderate to severe tendinopathy; partial tearing of the biceps tendon; mild to moderate AC joint osteoarthritis; a glenohumeral joint effusion; and a possible tear of the superior labrum. [Dkt. 8-25 at 16 (R. 1246).] In August 2015, Russell returned to Dr. Bell, still complaining of decreased range of motion and tenderness. [Dkt. 8-38 at 19 (R. 2140).] On August 27, 2015, Dr. Daniel Williams evaluated Russell's shoulder pain. [Dkt. 8-34 at 92 (R. 1991).] Russell decided to proceed with surgery on his left shoulder to address his continued pain, stiffness, and limited range of motion. [*Id* at 94 (R. 1993).] On September 1, 2015, Russell underwent a left shoulder arthroscopy; subpectoral biceps tenodesis; and subacromial decompression. [Dkt. 8-25 at 30-31 (R. 1260-61).]

In December 2015, Russell returned to Dr. Williams complaining of persistent right shoulder pain and stiffness. [Dkt. 8-34 at 96-97 (R. 1995-96).] Russell started physical therapy on both shoulders in December 2015 to address his limited range of motion, stiffness, and pain. [Dkt. 8-37 at 6 (R. 2097).] On March 8, 2016, Russell was discharged from physical therapy, but was noted to have recently received bilateral acromial joint steroid injections to assist with pain management. [Dkt. 8-37 at 9 (R. 2100).]

Russell argues that the ALJ provided only a perfunctory analysis when evaluating whether his shoulder impairments met or medically equaled Listing 1.02B. Russell further argues that the ALJ did not analyze the medical evidence or his own subjective complaints related to his shoulder issues and that because the ALJ included no analysis, the Court cannot determine whether the conclusion was supported by substantial evidence.

The Commissioner argues that the ALJ's opinion should be considered as a whole, rather than only considering the portion of the ALJ's opinion that directly addresses the Listings analysis. If considered as a whole, the ALJ exhaustively discusses the medical and opinion evidence. The Commissioner further argues that it was the Plaintiff's burden to demonstrate that the Listings were met or equaled and that it is discretionary for the ALJ to determine whether a medical expert is required to determine medical equivalency to a Listing.

The parties brief whether the ALJ's one sentence analysis of Russell's shoulder impairment was sufficient, but overlook the appropriate standard which

governs the Court's analysis. If the ALJ's decision had been rendered before March 27, 2017, the *Barnett v. Barnhart* case cited by the Plaintiff would be controlling. 381 F.3d 664 (7th Cir. 2004). Russell's Listing argument is undermined, however, by Social Security Ruling ("SSR") 17-2p, which was not addressed by either party. SSR 17-2p, (S.S.A. Mar. 27, 2017), 2017 WL 3928306, at *1. SSR 17-2p was published with an effective date of March 27, 2017. The Court finds that SSR 17-2p is applicable to the present case because the ALJ's decision was issued after the effective date of March 27, 2017. *See Walter R. v. Saul*, 1:18-cv-1042-DLP-SEB, 2019 WL 3773795, at *12 (S.D. Ind. Aug. 12, 2019). SSR 17-2p establishes the ALJ's articulation requirements when considering medical equivalence:

> If an adjudicator at the hearings or AC [Appeals Council] level believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

SSR 17-2p, 2017 WL 3928306, at *4. Here, the ALJ stated that Russell's shoulder impairments did not meet or medically equal Listing 1.02B because he remained able to perform fine and gross movements effectively. [Dkt. 8-2 at 17 (R. 16).] The ALJ cited to the consultative examinations of Dr. Roland Wilson and Dr. Richard Murphy to support her determination that Russell did not meet or medically equal

Listing 1.02. [*Id.*] Moreover, she relied on the determination by the State Agency reviewing physicians that Russell did not meet or medically equal Listing 1.02. [*Id*;] *see also, Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (ALJ properly relied on state agency physician opinion that listing was not met). When viewed as a whole, the ALJ provided sufficient rationale to support her finding that Russell's shoulder impairment does not meet or medically equal Listing 1.02B. Moreover, the ALJ's decision is supported by substantial evidence.

### B.  Neuropsychological Exam and Cognitive Impairment

Next, Russell claims that the ALJ improperly evaluated the medical opinion of Dr. Bradley Estes, which led to the ALJ conducting an inaccurate and incomplete RFC analysis related to Russell's cognitive impairments. [Dkt. 10 at 8-12.]  By extension, Russell argues that if the ALJ had properly evaluated Dr. Estes's medical opinion, the ALJ would have found him unable to perform his past relevant work as a service manager and, consequently, would have concluded that he was disabled under the Medical Vocational Guidelines. [*Id.*]

The Commissioner responds that the ALJ appropriately considered Dr. Estes's neuropsychological examination and provided good reasons for discounting his opinion. [Dkt. 16 at 11.] The Commissioner maintains that the ALJ was not required to address every piece of evidence in the record and that, even if the ALJ did not specifically mention all of the evidence of Russell's cognitive impairment, she provided a logical bridge between the evidence and her conclusions. [*Id* at 11-12.]

In Russell's reply brief, he reasserts that it was error for the ALJ to give great weight to the opinions of non-treating consultative examiners while she gave little weight to Dr. Estes's medical opinion. [Dkt. 17 at 5.] He argues that Dr. Estes is a licensed clinical psychologist with a specialty in neuropsychology who evaluated Russell's possible cognitive impairment over a two day period and his opinion should have been evaluated properly and given greater weight. [*Id*.]

One of Russell's treating physicians referred Russell to Dr. Estes for testing related to concerns of cognitive impairment and dementia, as well as for an EEG and B12 testing. [Dkt. 8-40 at 2 (R. 2273); Dkt. 8-38 at 10 (R. 2131); Dkt. 8-39 at 17 (R. 2209).] On January 18, 2017, Russell presented to Dr. Estes for various diagnostic testing that would evaluate his functioning, attention, memory, personality, and language skills. [*Id* at 2-4 (R. 2273-275).] When Russell returned for a follow-up visit on February 23, 2017, Dr. Estes informed him that the medical tests indicated he was "experiencing clinically significant disturbance in his ability to learn and retain new information and high-level attention control (i.e., sustaining attention, switching attention, and parallel processing)." [*Id* at 5 (R. 2276).] Dr. Estes concluded that although Russell's "type of depression is likely exacerbating focus issues, it cannot entirely account for the extent and nature of cognitive impairments being exhibited during testing. His memory problems likely have an organic basis, which in the context of his presenting concerns is suggestive of an insidious form of dementia." [*Id*.] Dr. Estes recommended that Russell receive

counseling or psychotherapy for his depression and that he continue taking Namenda for his memory. [*Id* at 5-6 (R. 2276-277).]

Dr. Estes evaluated Russell at his treating physician's request, but did not have an ongoing treatment relationship with him; thus, Dr. Estes is an examining physician. 20 C.F.R. 404.1527(c)(1) states that generally ALJs "give more weight to the medical opinion of a source who has examined [a claimant] than to the medical opinion of a medical source who has not examined [a claimant]." 20 C.F.R. 404.1527(c)(1). In *Gudgel v. Barnhart*, the Seventh Circuit held that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." 345 F.3d 467, 470 (7th Cir. 2003). If the ALJ determines that no medical opinion in the record deserves controlling weight, as happened in this case, the ALJ must consider every opinion in the record according to the relevant regulatory factors, which include whether the physician: examined the claimant; treated the claimant frequently or for an extended period of time; specialized in treating the claimant's condition; performed appropriate diagnostic tests; or offered opinions consistent with the objective medical evidence and the record as a whole. 20 C.F.R. 404.1527(c).

Here, the ALJ offered three reasons for discounting Dr. Estes's opinion: 1) it was inconsistent with the medical records; 2) it was inconsistent with Dr. Outcalt's report; and 3) it was inconsistent with Russell's activities of daily living. The Court will evaluate each reason in turn.

*a. Consistency with Medical Records*

First, the ALJ concludes that "[Russell's] medical records do not support" Dr. Estes's report and diagnosis of dementia. [Dkt. 8-2 at 23 (R. 22).] The records, however, do tend to support Dr. Estes's conclusions. In his applications to the SSA, Russell put the ALJ and the Agency on notice of his contention that his memory issues and cognitive impairments were one of the primary reasons he sought disability benefits. [Dkt. 8-7 at 15 (R. 278); Dkt. 8-7 at 46 (R. 309).] Next, Russell reported to his primary care physician, Dr. Erhard Bell, in as early as 2011 that he was experiencing issues with concentration, loss of sleep, low energy, anxiety, irritability, and sadness. [Dkt. 8-21 at 54-55 (R. 1010-11).] At that time, Dr. Bell began treating Russell for depression and anxiety and started a medication regimen of antidepressants and benzodiazepines that continued through the last visit to Dr. Bell in the record on April 6, 2016. [Dkt. 8-38 at 71 (R. 2192).] In April 2016, Russell reported that he felt both guilt and hopelessness, he experienced low energy, decreased appetite, a sad mood, and the worst concentration levels of his life. [*Id.*]

The ALJ does not seem to have evaluated Russell's dementia diagnosis from Dr. Estes in conjunction with the entirety of the medical evidence. Symptoms of dementia include: personality changes; depression; anxiety; agitation; inappropriate behavior; memory loss; difficulty with visual and spatial abilities, such as getting lost while driving; difficulty handling complex tasks; difficulty with planning and

organizing; difficulty with coordination and motor functions; and confusion and disorientation.[3]

It is true that Russell did not report to his primary care doctor every month about memory problems; but, when looking at the potential cognitive and psychological changes an individual may experience with a diagnosis of dementia, the ALJ should have considered a wider swatch of Russell's history. In July 2015, Russell reported to Dr. Outcalt that he no longer drove because he kept getting into car accidents and did not understand why. [Dkt. 8-24 at 48 (R. 1200.] He reported to his physical therapist on December 23, 2015 that he had been experiencing poor memory and was scheduled to see a neurologist in light of his family history of Alzheimer's. [Dkt. 8-38 at 10 (R. 2131).] His physical therapist noted on February 4, 2016 that Russell had decreased cognition, decreased ability to perform activities of daily living, and an altered sleep pattern. [Dkt. 8-37 at 6 (R. 2097).] Russell's testimony and records that reflect an onset of depression and anxiety around 2011, his history of falling, difficulty remembering daily tasks, and his difficulty with driving all support Dr. Estes's dementia diagnosis. [Dkt. 8-2 at 42 (R. 41); Dkt. 8-21 at 54-55 (R. 1010-11); Dkt. 8-34 at 36 (R. 1935).]

This is not a situation where a claimant attends one medical visit and receives an unforeseen diagnosis with no historical basis; here, over a 7-8 year period Russell consistently complained of worsening memory, concentration, mood, appetite, and sleep habits, all of which could be attributed to a diagnosis of

---

[3] *Dementia*, https://www.mayoclinic.org/diseases-conditions/dementia/symptoms-causes/syc-20352013 (last visited September 10, 2019).

dementia. Accordingly, the Court is not convinced that Dr. Estes's conclusion is inconsistent with the medical records.

b. *Consistency with Dr. Outcalt's Report*

Next, in discounting Dr. Estes's opinion, the ALJ notes that "Dr. Outcalt's report and opinion are very different [from Dr. Estes's.]" [Dkt. 8-2 at 23 (R. 22).] Though misstated in the ALJ's decision, Dr. Outcalt examined Russell on July 17, 2015, not August 31, 2016. [Dkt. 8-24 at 45 (R. 1197).] A year and a half later, Dr. Estes diagnosed Russell with an insidious form of dementia. It is not inconsistent for a gradually developing form of dementia to make itself known after a year and a half. The Seventh Circuit understands that degenerative spinal and neurological disorders start out mild and progress to become more severe over time[4]; with Dr. Estes's characterization of Russell's dementia as insidious, it is not unreasonable to conclude that his condition would behave in a similar fashion.[5]

Moreover, in weighing Dr. Estes's medical opinion, the ALJ did not consider his specialized training. S*ee* 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Dr. Estes obtained a Psy.D, a Doctor of Psychology, which is intended for individuals who

---

[4] *See Lambert v. Berryhill*, 896 F.3d 768, 775 (7th Cir. 2018) ("[d]egenerative conditions often get worse over time"); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("Roddy's condition was degenerative, meaning that is was likely that she had more limitations in 2010 than she did in 2008."); *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015) (Hill suffered from "osteoarthritis, which often grows more severe with the passage of time").

[5] An insidious medical condition is one "that comes on slowly and does not have obvious symptoms at first. The person is not aware of it beforehand." *Insidious*, https://medlineplus.gov/ency/article/002382.htm (last visited September 11, 2019).

want to provide psychological services to patients, rather than conduct disciplinary research.[6] Specifically, Dr. Estes chose neuropsychology as his specialty.[7] Thus, it would have been beneficial, as outlined in the regulatory factors, for the ALJ to consider whether Dr. Estes had the more appropriate training by which to examine and diagnose Russell's cognitive and behavioral functioning.

Russell reported to Dr. Outcalt that he experienced depression, anxiety symptoms about his future, poor appetite, lack of enjoyment due to his inability to engage in physical activities, and poor self-esteem. [Dkt. 8-24 at 46 (R. 1198).] Those self-reported symptoms are not inconsistent with what Dr. Estes reported during his evaluation of Russell. [Dkt. 8-40 at 4-5 (R. 2275-76).] It is also not unreasonable to conclude that, a year and a half after Dr. Outcalt's consultative exam, Russell's symptoms had progressively worsened to the point that dementia became a viable and apparent diagnosis. Accordingly, the Court is not convinced that Dr. Outcalt's report was inconsistent with Dr. Estes's opinion, especially insofar as almost two years had passed between the two opinions and significant neurological changes could have occurred in that time period.

c. *Consistency with Activities of Daily Living*

The ALJ states that "Dr. Estes's findings are inconsistent with the claimant's daily living activities. For example, the claimant lives by himself and manages his

---

[6] *See Doctoral Degrees in psychology: How are they different, or not so different?*, https://www.apa.org/ed/precollege/psn/2016/01/doctoral-degrees (last visited September 11, 2019).
[7] Clinical neuropsychology is a specialty field "dedicated to understanding the relationships between brain and behavior, particularly as these relationships can be applied to the diagnosis of brain disorder, assessment of cognitive and behavioral functioning and the design of effective treatment." *Clinical Neuropsychology,* https://www.apa.org/ed/graduate/specialize/neuro (last visited September 11, 2019).

own affairs; goes out alone; uses public transportation; shops; and manages his money. He reads the Bible and follows news." [Dkt. 8-2 at 23 (R. 22).] While it is appropriate for the ALJ to consider daily activities when evaluating credibility, "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit warns that "an ALJ cannot use activities of daily living to discredit a claimant's subjective symptoms without considering 1) how the claimant is specifically able to accomplish those activities; 2) the differences between working around the house with breaks and at his or her own pace versus meeting the demands of competitive, full-time employment; and 3) the assistance the claimant gets from others to perform the activities." *Amber S. v. Berryhill*, No. 1:17-CV-3966-WTL-MPB, 2018 WL 5262497, at *6 (S.D. Ind. Oct. 23, 2018) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

Here, the ALJ states that Russell's "activities of daily living show that he is more functional than he acknowledged at the hearing" and lists those activities as follows:

> The claimant lives by himself and manages his own affairs. He is the head of his household and the only person living in his apartment. He attends to his personal needs, manages his medications and takes care of household chores. He prepares food, fetches mail, cleans and does laundry. The claimant goes out alone. The claimant was driving as of May 15, 2015. He uses public transportation and Uber, and walks places. He goes shopping, walking to a drug store and to a grocery store, goes to the library and goes to the post office. He pays bills, counts change, and uses a checkbook or money orders. The claimant

17

reads the Bible. He watches television and follows news. The claimant worked as an Uber driver during the material period.

[Dkt. 8-2 at 24 (R. 23).] In providing this recitation, the ALJ cites to two of Russell's self-reported disability function reports and to his statements provided to Dr. Outcalt during the consultative exam.

From a brief review of those exhibits, it is clear that the ALJ misrepresented Russell's activities of daily living. While the Commissioner argues that the ALJ was not required to discuss every piece of evidence, it is not acceptable for the ALJ to misrepresent the extent of Russell's activities of daily living, leaving out the qualifying information as to those activities, and use that incorrect recitation to defend discounting Dr. Estes's opinion.

The ALJ summarizes the activities that Russell said he engaged in, but she neglected to include the qualifiers that Russell attached. While Russell did say that he cooked for himself, he said that it is harder to do now because he cannot stand at the stove, so he does something at the stove and then sits down, and repeats the process until he is finished. [Dkt. 8-24 at 47 (R. 1199).] The ALJ wrote that Russell does household chores like laundry and cleaning the apartment. Russell qualified this testimony, however, stating that he does laundry, but that he lets it build up for a while because his back hurts and he sweeps his apartment a few times a week. [*Id*.] He no longer hunts and fishes, his two favorite outdoor activities, because of his pain, and he spends the majority of his time now watching television. [*Id*.]

The ALJ suggests that Russell's ability to live alone, read the Bible, and walk to the grocery store one block away is inconsistent with a finding of disability.

Based on the record and Russell's statements, Russell has no family or friends to care for him and he lives alone [Dkt. 8-24 at 47 (R. 1199).]; it is not inconsistent with disability for an individual who lives alone to be able to bathe, feed, and dress oneself. *Cullinan v. Berryhill*, 878 F.3d 598 (7th Cir. 2017) (ALJ's failure to explain why performing household chores was inconsistent with claimant's description of pain and mobility was error); *Brown v. Colvin*, 845 F.3d 247, 253-54 (7th Cir. 2016) (ALJs should not equate daily living activities with the ability to perform a full day of work, because the former are often  subject to different restraints such as longer periods within which to complete and more frequent opportunities to rest); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (claimant's daily living activities "are fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain").

Accordingly, the Court does not find that Russell's activities of daily living are inconsistent with Dr. Estes's opinion. The Court finds that the ALJ's decision to discount Dr. Estes's opinion and dementia diagnosis was not supported by substantial evidence.

This issue of cognitive impairment is particularly sensitive given the vocational expert's testimony that a claimant with Russell's age, education, and work experience who was limited to simple, routine tasks and simple decisions with demonstration of changes and who would be off task 5% of the workday would be precluded from past relevant work. Based on the Medical Vocational Guidelines, if

Russell cannot perform his past work as a service manager, he would be deemed disabled. Therefore, the Court cannot consider the ALJ's decision to discount Dr. Estes's medical opinion and dementia diagnosis to be harmless error.

Accordingly, the Court determines that the ALJ did not provide a logical bridge between the evidence and her conclusions. On remand, the ALJ should properly evaluate Dr. Estes's medical opinion and report in light of the evidence of Russell's symptoms and limitations and in accordance with the 20 C.F.R. 404.1527(c) regulatory factors. If the ALJ determines that any further functional limitations related to memory, concentration, or dementia are not warranted by the record, he or she must provide adequate justification for not including those limitations in the RFC.

## V.     Conclusion

For the reasons detailed herein, this court **REVERSES** the ALJ's decision denying Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four) as detailed above. Final judgment will issue accordingly.

So ORDERED.


Date: 9/16/2019

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record.